**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| BEAULIEU GROUP, LLC, et al., | ) | PROPOSED |
| | ) | Jointly Administered Under |
| Debtors. | ) | CASE NO. 17-41677-mgd |
| | ) | |

**DECLARATION OF J. MICHAEL POLLARD**
**IN SUPPORT OF FIRST DAY APPLICATIONS AND MOTIONS**

I, J. Michael Pollard, declare under penalty of perjury as follows:

1.      I am the President of Beaulieu Group, LLC ("Beaulieu").  Beaulieu of America,

Inc. ("Beaulieu America") is a member/shareholder of Beaulieu, and Beaulieu Trucking, LLC

("Beaulieu Trucking") is a subsidiary, of which Beaulieu is the sole and controlling Member.

Each of Beaulieu, Beaulieu America, and Beaulieu Trucking is a debtor and debtor-in-possession

("collectively, the "Debtors").  In my capacity as President of Beaulieu, I am familiar with the

business and financial affairs of the Debtors.

2.      I submit this declaration in support of the Debtors' petitions for relief under

chapter 11 of the Bankruptcy Code and in support of the Debtors' First Day Motions (as herein

defined).  Except as otherwise indicated, all statements set forth in this declaration are based

upon my personal knowledge, my review of relevant documents, information provided by

employees under my supervision or professionals retained by the Debtors, or my opinion based

upon my experience and knowledge of the Debtors' operations and financial affairs.  Opinions

regarding compliance with applicable statutes or rules are based upon advice of counsel.  If

called upon to testify, I would testify to the facts set forth herein.

3.      To minimize the adverse effects of filing for chapter 11 protection while at the same time maximizing value for the benefit of stakeholders, the Debtors have filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings") concurrently with the filing of this declaration.  A list of the First Day Pleadings is attached hereto as Exhibit "A."  I am familiar with the contents of each First Day Pleading and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption; (b) is critical to the Debtors' efforts to preserve value and maximize recoveries; and (c) best serves the Debtors' estates and creditors' interests.  Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these chapter 11 cases.

4.      Part I of this declaration provides an overview of the Debtors' business and corporate structure, the circumstances surrounding the commencement of these cases, and the Debtors' prepetition indebtedness.  Part II sets forth relevant facts in support of the First Day Pleadings, and other motions and applications.

## I. BACKGROUND

5.      On July 16, 2017 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to operate their business as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.      Beaulieu is one of the largest, vertically integrated carpet manufacturers in North America, and is also engaged in the distribution of carpet and hard surface flooring products in both residential and commercial markets in the United States and many foreign countries.

A.  <u>Description of the Debtors' Business Operations</u>

7.      Beaulieu was founded in 1978 by Carl M. Bouckaert and Mieke D. Hanssens, and the ownership of the Beaulieu business, including the Debtors, remains with Mr. Bouckaert, Ms. Hanssens, and their four adult children.

8.      Beaulieu was a pioneer in the carpet industry in developing vertically integrated manufacturing and distribution operations that run from raw materials to carpet manufacturing through sales and distribution.  This resin-to-carpet vertical integration has provided cost advantages over competitors who purchase their materials from third parties.

9.      As shown on Exhibit "B" attached hereto, Debtor Beaulieu Group has the following ownership:

      a.  10,000 Class A Units, of which 6,400 units are held by the CAMI Trust, a trust owned by the four Bouckaert children, and 1,800 units each held by Carl M. Bouckaert and Mieke D. Hanssens;

      b.  3,625.96 Voting Units, of which Mr. Bouckaert and Ms. Hanssens each own 50%; and

      c.  6,374.04 Non-Voting Units, of which the CAMI Trust owns 6,274.14 units and Beaulieu America owns 99.90 units.

10.      Beaulieu America is a non-operating entity that only holds non-voting units of Beaulieu.  Beaulieu America is a Georgia s corporation whose only shareholders are Carl M. Bouckaert and Mieke D. Hanssens.  Beaulieu Trucking is also a non-operating entity that does not have any assets or employees.  It is a Delaware limited liability company and Beaulieu is the sole member of Beaulieu Trucking.

11.    Approximately 87% of Beaulieu's sales are carpet-related, but hard surfaces (including luxury vinyl planks, luxury vinyl tiles, wood plastic composite, engineered hardwood, and sheet vinyl) represent a growing part of the business.

12.    Beaulieu has eight manufacturing facilities in Georgia and one in Alabama, and three distribution facilities in Georgia, California and Chicago, Illinois.  The Debtors' largest manufacturing and distribution facilities are in Dalton, Georgia.

13.    In its residential segments, which represented 82% of revenue in 2016, Beaulieu sells carpet and hard surface flooring products to over 14,000 independent retailers and several big box retailers in North America.  Beaulieu's residential business includes sales in the multi-family, or apartment, markets and to select builders.  A typical end-user of Beaulieu's residential products are homeowners, but also included in this segment are sales categorized as "Main Street Commercial" off the shelf carpet supplied for small commercial projects.

14.    The commercial business, which represented 18% of Beaulieu's revenue in 2016, sells products to end users through architecture and design firms and independent commercial flooring dealers.  Beaulieu has a strong and broad presence in all commercial flooring categories with a full selection of products in corporate, specified contract, hospitality, education, and health care.

15.    As of the Petition Date, the Debtors have approximately 2500 full and part-time hourly and salaried employees.  These employees are not subject to collective bargaining agreements.

B.  Prepetition Indebtedness

16.    Revolving Loan Facility.  Beaulieu, the financial institutions party thereto from time to time as lenders (collectively, the "Lender Group"), and Bank of America, N.A., in its capacity as administrative and collateral agent for the Lender Group ("Bank of America") are parties to that certain Amended and Restated Loan and Security Agreement dated October 20, 2011 (as amended and otherwise modified from time to time, the "Revolving Loan Agreement"). The loans and other extensions of credit under the Revolving Loan Agreement are guaranteed by Beaulieu America and Beaulieu Trucking.  As security for the indebtedness under the Revolving Loan Agreement, the Lender Group asserts a first priority lien in the Debtors' liquid assets, including accounts receivable and inventory, and a second priority lien in the Debtors' hard assets, including real estate and equipment.  The Revolving Loan Agreement matured on June 30, 2017 and has been the subject of multiple forbearance agreements as described in paragraph 26 hereof.  As of the Petition Date, the financial institutions in the Lender Group were Bank of America, PNC Bank, and Synovus Bank; and the total amount due under the Revolving Loan Agreement was approximately $51,792,227.00, including $6,574,000.00 in letter of credit obligations.

17.    Term Loan.  Beaulieu and Cygnets, LLC ("Cygnets") are parties to that certain Term Loan and Security Agreement dated October 20, 2011 (as amended and otherwise modified from time to time, the "Term Loan Agreement") pursuant to which Cygnets extended a $29 million secured loan to Beaulieu.   Cygnets is an entity owned and managed by Mieke D. Hanssens, one of the founders of the Beaulieu business.  As security for the indebtedness under the Term Loan Agreement, Cygnets asserts a first priority lien in the Debtors' real estate and equipment, and a second priority lien in the Debtors' accounts receivable and inventory.  As of

- 5 -

the Petition Date, the total amount due under the Term Loan Agreement was approximately

$15,816,000.

18.    <u>Third-Lien Term Loan</u>.  Beaulieu and CT Lender, LLC ("<u>CT Lender</u>") are parties

to that certain Subordinated Third-Lien Term Loan Promissory Note dated September 1, 2016

(as amended and otherwise modified from time to time, the "<u>Third-Lien Term Loan</u>") pursuant

to which CT Lender extended a $6 million secured loan to Beaulieu.  CT Lender is an entity

owned by The CAMI Trust.  As security for the indebtedness under the Third-Lien Term Loan,

CT Lender asserts that the Third-Lien Term Loan is secured by a third priority lien in all of the

Debtors' assets.  As of the Petition Date, the total amount due under the Third-Lien Term Loan

was approximately $6,000,000.

19.    <u>Unsecured Debt</u>.  As of the Petition Date, the Debtors' outstanding accounts

payable were approximately $69,000,000.

C.  <u>Events Leading to Chapter 11 Filing</u>

20.    While the carpet industry remains a $10 billion market annually in the United

States, consumer preference has gradually shifted toward hardwood flooring products.  At the

same time, competition in the carpet industry has increased and caused more downward pressure

on pricing.  Over the last 10 years, Beaulieu's revenue has declined from over $1 billion in 2007

to approximately $525 million in 2016, while its market share has decreased from 7.7% to 4.4%.

21.    Beaulieu remains well positioned to recapture market share by capitalizing on its

vertical integration advantages, national sales force, long-standing relationships, comprehensive

carpet offerings in the residential and commercial markets, and recent focus on hard surface flooring.

22.     In 2016, Beaulieu added independent directors to its board of directors and brought in new senior management to develop a business turnaround and transformation plan. That included right-sizing the organization, streamlining plants and operations, selling non-core assets, and developing new products.  Management has been able to streamline operations, in an effort to generate cost savings as well as reducing bank debt.  Beaulieu remains in the process of consolidating its manufacturing facilities, monetizing its PP&E; and right-sizing its production capacity.

23.     Meanwhile, however, Beaulieu's overhead and cost structure, which had been developed and utilized for a much larger business, still needs further streamlining and refining for the current business and operations.   Adjusted EBIDTA was negative $16 million in 2016. Over time, Beaulieu's borrowing base has decreased and it had had insufficient liquidity to complete its turnaround efforts.

24.     After one or more events of default were declared under the Revolving Loan Facility, starting in December, 2016, Beaulieu entered into a series of forbearance agreements with the Bank of America and the Lender Group.  From December 16, 2016 through June 30, 2017, the parties executed 7 forbearance agreements, and in conjunction with these forbearance extensions, the Lenders increased a block on availability under the borrowing base formula.  The availability block rapidly increased to $20 million on a revolving loan balance of less than $60 million, which has further exacerbated the Debtor's liquidity issues.

- 7 -

25.     As stated above, on June 30, 2017, the Revolving Loan Facility matured.  On that date, the parties executed an eighth forbearance agreement for a period of 2 weeks through July 14, 2017.  Subsequently, when it became apparent that the Lender Group would not agree to further extensions of the forbearance agreement, the Debtors, in consultation with their advisors, decided to seek relief under Chapter 11 of the Bankruptcy Code in order to preserve and enhance the value of their business and assets for their employees, customers, vendors and other stakeholders.  The Debtors are optimistic that Chapter 11 will allow them time to restructure their business affairs and pursue one or more strategies for successful emergence from Chapter 11.

## II.      THE FIRST DAY MOTIONS

26.     It is imperative that the Debtors make a seamless transition into chapter 11 to preserve the reputation of their business and the loyalty and goodwill of their customers, suppliers, and employees.  Sales and operations must continue in the ordinary course of business to preserve the value of the Debtors' estates.  Accordingly, the Debtors have filed a number of first day motions and applications, listed on Exhibit A attached hereto (collectively, the "First Day Motions")  designed to facilitate their transition into chapter 11.

27.     I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct.  Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

- 8 -

28.     As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtors' executives and discussions with outside advisors, I have formed opinions as to: (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtors to continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions.

29.     As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the Chapter 11 cases on the Debtors and ensure that the Debtors' reorganization efforts proceed as efficiently as possible and result in maximum recovery for creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate as debtors-in-possession.

### A.  Administrative Motions

**(i)      Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")**

30.     In the Joint Administration Motion, the Debtors request entry of an order (i) directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b), (ii) authorizing the Debtors to utilize a combined service list, and (iii) granting authority to file monthly operating reports on a consolidating basis.

31.     There are three Debtors.  Beaulieu of America Inc. controls 99.9 units of non-voting shares in Beaulieu Group LLC.  Beaulieu Group LLC is the sole parent of Beaulieu Trucking LLC.  The Debtors are requesting that the Court jointly administer the three related bankruptcy cases in order to promote judicial efficiency and to minimize the administrative

expense to each of the Debtor's estates.  All the Debtors are borrowers or guarantors under the
Revolving Loan Facility.  As a result, many of the motions and orders that will be filed and
entered in the Chapter 11 Cases will affect each Debtor.  The entry of an order directing joint
administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings
and objections and will allow all parties in interest to monitor the Chapter 11 Cases with greater
ease and efficiency.

32.     Joint administration of the Chapter 11 Cases will allow for the efficient and
convenient administration of the Debtors' interrelated Chapter 11 Cases, will yield significant
cost savings, and will not prejudice the substantive rights of any party in interest.

(ii)     **Debtor's Emergency Motion for an Order to Extend Time to File Schedules
and Statement of Financial Affairs (the "<u>Schedules and Statements Motion</u>")**

33.     The Debtors request entry of an order granting additional time to file their
schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and
statements of financial affairs.  As a consequence of the size and complexity of the Debtors'
business operations, the number of creditors likely to be involved in the Chapter 11 Cases, the
geographical breadth of the Debtors' operations, the numerous critical operational matters that
the Debtors' management and employees must address, a 16-day extension (without prejudice to
further extensions) is necessary and appropriate.  The extension will ultimately maximize the
value of the Debtors' estates for the benefit of their creditors and all other parties in interest.

(iii)     **Debtors' Emergency Motion for an Order Establishing Notice and
Administrative Procedures (the "<u>Notice Procedures Motion</u>")**

34.     Given the size and scope of these cases, the Notice Procedures Motion will
facilitate service of notices, motions, applications, declarations, objections, responses,

- 10 -

memoranda, briefs, supporting documents, and other papers filed in the Chapter 11 Cases that will be less burdensome and costly than serving such documents on every potentially interested party. This, in turn, will maximize the efficiency and orderly administration of the Chapter 11 Cases, while at the same time ensuring that appropriate notice is provided.

      **(iv)**    **Debtors' Motion for an Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals (the "<u>Monthly Compensation Motion</u>")**

35.      The Debtors believe that the relief requested in the Monthly Compensation Motion will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees incurred in this case more effectively.

36.      Briefly stated, the requested procedures would permit each Professional to serve upon counsel for the Debtors, the Office of the United States Trustee, counsel to all official committees and counsel to the DIP lenders a statement of fees and expenses incurred by the Professional during the preceding month (a "<u>Monthly Statement</u>"). Subject to the terms and conditions of any order granting the DIP Financing Motion (described below), the Debtors would be authorized to pay each Professional the fees and expenses requested in the Monthly Statement in the absence of an objection received within ten (10) days after service of the Monthly Statement. All fees and expenses of each Professional, whether or not paid or objected to in connection with a Monthly Statement, would remain subject to review and approval by the Court in connection with interim and final fee applications under Sections 330 and 331 of the Bankruptcy Code.

**(v)      Application For Authority to Retain American Legal Claim Services, LLC as Claims, Noticing, and Balloting Agent (the "<u>Claims Agent Application</u>")**

37.      The Debtors request authority to retain American Legal Claim Services, LLC as claims and noticing agent in accordance with the terms and conditions of that certain engagement agreement dated July 16, 2017 by and between American Legal Claim Services, LLC and the Debtors.  American Legal Claim Services' duties will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these Chapter 11 Cases.  I believe the Debtors' selection of American Legal Claim Services to serve as their Claims and Noticing Agent has satisfied the Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c).  Specifically, the Debtors have solicited and reviewed engagement proposals from at least two other claims and noticing agents to ensure selection through a competitive process.

38.      I believe that American Legal Claim Services' rates are competitive and reasonable given American Legal Claim Services quality of service and expertise.  The terms of Prime Clerk's retention are set forth in the engagement agreement attached to, and filed contemporaneously with, the Claims Agent Application.  Appointing American Legal Claim Services as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing a large number of claims and notices.

### B.  Operational Motions

**(i)      Debtors' Motion for Interim and Final Orders  (I) Authorizing (A) Secured
Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, and 364(c)
and (d); (B) Granting Security Interests, Superpriority Claims, and
Adequate Protection, and (C) Use of Cash Collateral and (II) Scheduling a
Final Hearing; and Memorandum of Points and Authorities (the "DIP
Financing Motion")**

39.      The Debtors do not have sufficient available sources of working capital and

financing to carry on the operation of their businesses without post-petition financing.  The

ability of the Debtors to finance their operations, and the availability of sufficient working

capital and liquidity through the incurrence of new indebtedness for borrowed money, is

essential to the Debtors' ability to operate their businesses.  In the absence of such financing, the

operation of the Debtors' businesses would not be possible and serious and irreparable harm to

the Debtors and their estates would occur.

40.      By the DIP Financing Motion, the Debtors seek the authority to obtain post-

petition financing and use of cash collateral under the terms set forth in the proposed Interim

Order attached as an exhibit to the DIP Financing Motion.  The DIP Financing Motion seeks

authorization to borrow $70,000,000.00 pursuant to the terms of the DIP Facility.

41.      The DIP Facility will repay the amounts outstanding under the prepetition

Revolving Loan Facility, will provide additional funding to the Debtors up to $10 million over a

110-day period, subject to timely achieving certain milestones as follows:

a.  Filing of Chapter 11 petitions (Petition Date) – $2.5 million

b.  Application to retain investment banker (10 days after Petition Date) – $2.0
    million

     c.    Stalking horse asset purchase agreement (50 days after Petition Date) - $2.5 million

     d.    Entry of bid procedures order (80 days after Petition Date) - $1.5 million

     e.    Entry of sale order (110 days after Petition Date) - $1.5 million

42.    The source of each additional funding is a release from the $20 million availability block on the borrowing base under the revolving loan.

43.    Otherwise, the Debtors postpetition operations will be funded by the use of Cash Collateral.  The Debtors are also seeking authority to use their Cash Collateral to, among other things, fund the cash needs related to their operations (including amounts necessary to administer the Chapter 11 Cases) (the Cash Collateral, in conjunction with the DIP Facility, the "Post-Petition Financing").  The Debtors' access to sufficient working capital and liquidity, aided by the use of Cash Collateral, and the incurrence of new indebtedness under the DIP Facility is vital to the Debtors' ability to pursue their chapter 11 strategy.

44.    The Post-Petition Financing will be secured by, among other things, a first priority senior lien on the Debtors accounts receivable and inventory, and a second priority lien junior to Cygnets on the Debtors' real estate and equipment.  The rights and lien priority between the DIP Lender and Cygnets are subject to the terms of a Sixth Amendment to Intercreditor Agreement.

45.    Prior to the Chapter 11 filing, the Debtors contacted potential lenders, seeking alternative financing sources.  The Post-Petition Financing proposed by the DIP Lender represents the best source of financing available to the Debtors.  The Debtors' management, with the advice of professionals,  exercised their best business judgment in negotiating the DIP Facility that is presently before the Court.

46.     The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the Post-Petition Financing.  The terms of the Post-Petition Financing are fair and reasonable, are in the best interests of the Debtors' estates and have been negotiated in good faith and at arm's length.  Without the liquidity provided by the Post-Petition Financing, the Debtors will be unable to pay vendors, employees and other constituencies that are essential to the orderly operation of their businesses.  For these reasons, access to credit under the Post-Petition Financing is critical.

47.     A proposed Interim Order is attached as an exhibit to the DIP Financing Motion. Pending the Final Hearing (as defined in the DIP Financing Motion), the Debtors require immediate financing under the terms and conditions set forth in said Interim Order for, among other things, financing their operations and other working capital needs.  It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, post-petition operating expenses, as well as the pre-petition expenses approved in the first day orders, to minimize the damage occasioned by their cash flow problems.

48.     Absent immediate financing, the Debtors will be unable to pay ongoing operational expenses.  Consequently, if interim relief is not obtained, the Debtors' assets will be immediately and irreparably jeopardized, to the detriment of their estates, their creditors and other parties in interest.

    **(ii)     Motion for Authority to (A) Maintain Existing Bank Accounts and Cash Management System, and (B) Continue Use of Existing Business Forms (the "Cash Management Motion")**

49.     The Debtors request authorization to (i) continue to maintain their existing bank accounts and to utilize the Cash Management System; (ii) continue to utilize their existing

business forms, including checks; and (iii) granting a waiver, to the extent required, from certain

United States Trustee's guidelines

50.     In the ordinary course of business, the Debtors utilize an integrated, centralized

cash management system to collect, transfer, and disburse funds generated by their operations.

Prior to the commencement of these Chapter 11 cases, Beaulieu maintained approximately 10

bank accounts, a schedule of which is attached to the Cash Management Motion as Exhibit A.

Beaulieu Group's cash management bank is Bank of America.  A chart illustrating the pre-

petition Cash Management System is attached to the Cash Management Motion as Exhibit B and

a chart illustrating the post-petition Cash Management System is attached to the Cash

Management Motion as Exhibit C.

51.     It is critical for the Debtors to be able to continue their existing cash management

system (as modified by the DIP Financing Motion) during the pendency of these Chapter 11

cases.  Any disruption to the Debtors' ordinary business affairs at this critical stage in the

reorganization process could adversely impact their ability to successfully reorganize.

52.     The Debtors' pre-petition bank accounts and business forms are integrally related

to the Debtors' cash management system.  Thus, maintenance of the Debtors' current accounts

and forms is necessary to avoid delays, confusion, and disruption of the Debtors' business.

53.     Finally, it is imperative that the Debtors' banks and other financial institutions be

authorized to continue to service and administer the Debtors' bank accounts as debtors in

possession without interruption and in the ordinary course, and be authorized to rely on the

representations of the Debtors as to which account transactions are permitted, in order to

maintain the Debtors' cash management systems.

- 16 -

     **(iii)**    **Debtors' Emergency Motion for Authority to Continue Pre-Existing Insurance Programs and To Pay Pre-Petition Premiums and Related Obligations (the "<u>Insurance Motion</u>")**

54.     In connection with the operation of their businesses, the Debtors maintain various insurance programs including, without limitation, general liability, umbrella liability, foreign liability, property, flood, commercial automobile, ocean cargo, crime, kidnap/ransom, cyber liability, environmental liability, attorney professional liability, nurse and EMT professional liability, fiduciary liability, trade credit, surety bonds, workers' compensation and D&O insurance policies (collectively, the "<u>Insurance Programs</u>") through several different insurance carriers (the "<u>Insurance Carriers</u>") including, but not limited to, those Insurance Programs and Insurance Carriers listed on Exhibit A to the Insurance Motion.

55.     The Debtors believe that they are current on all insurance premiums with respect to the prepetition period.  However, to the extent there are outstanding insurance policy premiums payable by the Debtors that relate (in whole or in part) to the pre-petition period, the Debtors seek authority to pay these pre-petition premiums in the ordinary course as such payments are necessary to keep its insurance policies and programs in force.

56.     Further, certain of the insurance policies will expire in the next few months and thereafter.  As a result, the Debtors may be required to renew or enter into new policies to replace the expiring policies, and the new policies may require the Debtors to pay premiums in advance.  The Debtors seek authority from the Court to renew all polices in the ordinary course.

57.     Under Georgia law, the Debtors are also required to maintain workers' compensation policies and programs to provide their employees with coverage for claims arising from or related to their employment with the Debtors.

58.      Worker's compensation coverage for the Debtors' employees in the states of
Alabama and Georgia is maintained through a self-managed workers' compensation program.  In
addition, for employees in Alabama and Georgia, the Debtors have an excess workers'
compensation policy with Safety National Casualty Corporation covering employer exposure
greater than $1,000,000.  For all other states, Debtors have a workers' compensation AOS
policy, also with Safety National Casualty Corporation

59.      Many of the Debtors' Insurance Programs require annual premium payments to
be made at the beginning of the applicable policy period.  Because it is not always economically
advantageous for the Debtors to pay premiums on a lump-sum basis, the Debtors finance certain
of their premiums, including, without limitation, the premium payments pertaining to property
insurance, fiduciary duties, and criminal activity.  The Debtors financed such premiums for the
current policy year pursuant to a commercial premium financing agreement, dated June 1, 2017,
entered into with First Insurance Funding Corp. the ("Premium Financing Agreement").

60.      Under the Premium Financing Agreement, the Debtors financed premium
payments owed on account of certain insurance programs totaling $1,569,148.00.  The Debtors'
made a cash down payment of $392,287.00 leaving a balance of $1,176,861.00, plus a finance
charge of $20,641.56.  The financed premium payments are paid by First Insurance Funding
Corp. to the Debtors' respective Insurance Carriers when due (at the beginning of the applicable
policy period).  In exchange, the Debtors repay First Insurance Funding Corp. in monthly
installments under the Premium Financing Arrangement.  The amounts financed on each of the
applicable insurance policies accrue interest at 4.19 percent.  As part of the Premium Financing
Agreement, the Debtors granted First Insurance Funding Corp. a security interest in, among other
things, the financed policies and any additional premiums required under the financed policies,

including all return premiums, dividend payments, and loss payments which reduce unearned premiums.

61.     As of the Petition Date, the Debtors are current on payments owed to First Insurance Funding Corp under the Premium Financing Agreement.  The aggregate amount outstanding on the Premium Financing Agreement is approximately $1,064,446.72 including the finance charge, payable in eight remaining monthly installments of approximately $133,055.84 each.

62.     It is essential to the continued operation of the Debtors' business and their efforts to reorganize that the Insurance Programs be maintained on an ongoing and uninterrupted basis. The failure to pay premiums when due may affect the Debtors' ability to renew the insurance policies.  If the insurance policies are allowed to lapse, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ongoing business operations.  Such a result would also place at risk the estates' assets that are necessary to satisfy secured and unsecured claims.

63.     Therefore, it is essential that the Debtors be authorized to (a) maintain the Insurance Programs; (b) to pay, in their sole discretion, pre-petition amounts accrued in connection therewith, including payments under the Premium Financing Agreement; (c) to use estate funds for costs associated with renewing the Insurance Programs or obtaining replacement coverage; and (d) authorizing the Debtors' bank to receive, process, and pay all checks and other transfers related to such obligations.

> **(iv)**    **Debtors' Emergency Motion to Authorize Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits and Related Expenses, and Other Compensation to Employees (the "<u>Wage Motion</u>")**

64.    The Debtors employ approximately 2,587 people (the "Employees"), of which approximately 524 are employed on a full-time salaried basis and approximately 2,063 are employed on a full-time or part-time hourly basis.  All of the Employees are employed by Debtor Beaulieu Group, LLC.  Debtors also utilize certain independent contractors and temp agencies.

65.    The Debtors are seeking authority to pay certain wages, compensation, and benefits more fully described in the Wage Motion (the "Employee Obligations") that become payable during the pendency of these chapter 11 cases and to continue at this time their practices, programs, and policies with respect to their employees and independent contractors.  Even though the Debtors have incurred certain Employee Obligations prior to the Petition Date, certain of the Employee Obligations will become due and payable in the ordinary course of the Debtors' business on and after the Petition Date.  The Employee Obligations include, without limitation: (i) wages, salary, and other compensation; (ii) payroll taxes; (iii) vacation programs; (iv) qualified 401(k) plan obligations; and (v) health and welfare benefits.

66.    It is my understanding that Pursuant to the Bankruptcy Code, a debtor's employees' claims for "wages, salaries, or commission, including vacation, severance, and sick leave pay" earned within one hundred eighty (180) days before the Petition Date, and claims against the debtor for contributions to employee benefit plans arising from services rendered within one hundred eighty (180) days before the Petition Date, are afforded unsecured priority status to the extent the claims do not exceed $12,850.  As of the Petition Date, the Debtors do not believe there are any Employees for whom payments on Employee Obligations would exceed $12,850, except (i) the reimbursement of relocation expenses for certain Employees would cause

- 20 -

the amounts paid under the provisions of this Motion to exceed $12,850 for such Employees, (ii) commissions in the approximate amount of $650,000 are owed to approximately 200 salaried Employees, but the exact amount of outstanding commissions cannot be calculated as of the date hereof; however, it would not be typical for any outstanding commission to exceed $12,850, and (iii) one disputed commission, asserted in the amount of $10,000, was incurred more than 180 days prior to the Petition Date.   Accordingly, the Debtors believe that the vast majority (if not all) of the Employee Obligations would constitute priority claims.

67.     Any delay in paying Employee Obligations will adversely impact the Debtors' relationships with their Employees and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtors rely in order for its business to be successful.  The Debtors must have the support of their Employees in order for the Debtors' efforts in this chapter 11 case to succeed.

68.     Moreover, absent an order granting the relief requested in this Motion, the Debtors' Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the Employees to meet their own personal financial obligations.  The stability of the Debtors will thus be undermined, perhaps irreparably, by the possibility that otherwise loyal Employees will seek other employment alternatives.  At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a decline in employees' morale attributable to the Debtors' failure to pay previously earned wages, salaries, benefits, and other similar items.

**(v)      Debtors' Emergency Motion for an Order Authorizing the Debtors To Honor Prepetition Obligations To and Continue Prepetition Practices With Shippers, Warehousemen, Brokers and Other Miscellaneous Lien Claimants (the "<u>Lien Claimants Motion</u>")**

69.      The Debtors coordinate a national operation using over a dozen facilities and manufacturing centers.  To deliver the Products among the facilities and to the Debtors' customers, the Debtors require the coordinated efforts of transportation service providers, including (i) critical freight shipment providers; (ii) warehouse and distribution center operators, mechanics and workers; and (iii) import, export and customs brokers.

70.      It is my understanding that under some state laws, these transportation providers may have liens on the goods in their possession, which secures the charges or expenses incurred in connection with the transportation and/or storage of the goods.   Accordingly, certain transportation providers may assert that they are entitled to possessory liens for transportation, shipment and delivery or storage of the Debtors' materials and goods in their possession and may refuse to deliver or release such materials and goods before their lien claims have been satisfied and redeemed.  Such interruption or delay will likely have a material adverse impact on the Debtors' operations and efforts to maximize the value of its estate.

71.      Further, the Debtors regularly make improvements and repairs to their property, including the furniture, fixtures, and equipment located in warehouses and distribution centers. To do so, the Debtors contract with numerous third parties who could potentially assert liens, including mechanic's liens, artisan's liens, and materialman's liens against the Debtors' property. If the Debtors are unable to pay these lien claims, the Debtors risk losing access to equipment and other property that is critical to the continued operation of the business.

72.     Given these concerns, the Debtors are requesting an order authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to honor prepetition lien obligations up to $600,000.00 in the aggregate and to continue prepetition practices with the Debtors' transportation providers.

73.     In resolving the Debtors obligation to any of the Lien Claimants, the Debtors will, in their discretion, attempt to condition any payment on the written acknowledgement from the applicable Lien Claimant that such Lien Claimant will continue to provide its services to the Debtors on terms that, at a minimum, it provided to the Debtors prior to the Petition Date, or such other trade practices and programs that are at least as favorable to the Debtors as those in effect prior to the Petition Date.  The Debtors reserve the right to negotiate more favorable terms with any Lien Claimant as a condition to payment of any such obligation.  Further, the Debtors will only pay the claims of the Lien Claimants that it believes, in its business judgment, are necessary or appropriate.  In determining whether such payments are necessary or appropriate, the Debtors will consider: (a) whether the benefits to the Debtors' estate and creditors from making such payments would exceed the costs that the Debtors would incur by bringing actions to compel the turnover of such goods; (b) the delays associated with such actions; and (c) whether the additional expenses the Debtors would incur (likely in the form of premium shipping costs) to replace the certain of the Lien Claimants would exceed the amount of unpaid prepetition claims.

74.     The Debtors believe that the total amount to be paid to the Lien Claimants is minimal compared to (a) the importance and necessity of their services to (i) the Debtors' transport system and ongoing construction operations and (ii) maintaining the value of the Debtors' business and assets and (b) the losses the Debtors may suffer if those payments were

not made.  Accordingly, permitting the Debtors to honor certain undisputed prepetition

possessory lien claims of the Lien Claimants is in the best interests of the Debtors' estates and

creditors.

**(vi)    Debtors' Emergency Motion for Interim and Final Orders (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

75.    Utility services are essential to the Debtors' ability to sustain their operations

while these chapter 11 cases are pending.  In the normal conduct of their business, the Debtors

have direct relationships with approximately 42 utility companies for the provision of electric,

gas, telephone, internet, and other services.  A list identifying the Utility Companies and their

notice addresses is attached hereto as Exhibit A to the Utilities Motion.

76.    The Debtors have attempted to remain current with regard to their utility bills and

to the best of the Debtors' knowledge, the Debtors are current on all amounts owing to utility

companies, other than payment interruptions that may be caused by the commencement of these

chapter 11 cases.

77.    Continued and uninterrupted utility service is vital to the Debtors' ability to

sustain their operations during these chapter 11 cases. Because of the nature of the Debtors'

operations, termination or interruption of the Debtors' utility service would dramatically impair

the Debtors' ability to conduct business and would cause considerable inconvenience to the

Debtors' customers and employees.

78.    The Debtors are seeking an interim and final order (a) prohibiting the Utility

Companies from altering, refusing, or discontinuing service on account of prepetition invoices,

(b) deeming utilities adequately assured of future performance, and (c) establishing the Adequate

Assurance Procedures for determining adequate assurance of payment.

79.     The Debtors intend to pay all post-petition obligations owed to the Utility

Companies in a timely manner and expect that they will have funds sufficient to pay all post-

petition utility obligations.

80.     It is my understanding that the Bankruptcy Code requires Debtors to provide

certain adequate assurance of payment for future services.  The Debtors propose to deposit into a

newly-created, segregated, interest-bearing bank account a sum equal to the cost of two weeks'

worth of the average utility cost for each Utility Company (less any amounts already on deposit

with any such Utility Company that have not been applied to outstanding prepetition amounts),

based on the Debtors' average usage per week over the past five weeks (collectively, the

"Adequate Assurance Deposit").  As of the Petition Date, the Debtors estimate that the Adequate

Assurance Deposit will total approximately $484,333.

81.     Although the Adequate Assurance Deposit will be placed into a single bank

account, two weeks' worth of estimated utility costs will be separately allocated for, and payable

to, each Utility Company.

82.     The Debtors believe the Adequate Assurance Deposit, in conjunction with the

Debtors' ability to pay for future utility services in the ordinary course of business constitute

sufficient adequate assurance to the Utility Companies.  If any Utility Company believes

additional assurance is required, they may request such assurance pursuant to the Proposed

Determination Procedures as described in the Utilities Motion.

83.     The relief requested in the Utilities Motion will ensure that the Debtors'
operations will not be disrupted by the suspension or termination of vital utility services or the
requests by the Utility Companies of unnecessarily large deposits that could endanger the
Debtors' liquidity.  If a disruption occurs, the impact on the Debtors' business operations and
revenues would be extremely harmful to the Debtors and all of their creditors.  Without the
requested relief, any interruption in services by the Utility Companies could significantly
endanger the Debtors' business and the value of the estates.

**(vi)     Debtors' Emergency Motion for an Order Authorizing the Debtors to Pay
Pre-Petition Sales, Use, Trust Fund, and Other Taxes and Related
Obligations (the "Tax Motion")**

84.     The Debtors seek authority to pay, in their sole discretion, undisputed pre-petition
sales, use and other similar taxes necessary to operate their business (the "Taxes") owed to
various state taxing authorities (collectively, the "Taxing Authorities") in the ordinary course of
business.  The estimated aggregate amount, by state, of prepetition Taxes owed to the applicable
Taxing Authorities in each state is listed on Exhibit A to the Tax Motion.

85.     The Tax Motion should be granted because, among other things, (i) certain of the
taxes may constitute "trust fund" taxes and the funds representing such Taxes are not property of
the Debtors' estate, (ii) such taxes may constitute priority taxes, and (iii) the failure to pay the
Taxes could disrupt the Debtors' business.

86.     In connection with the normal operation of its business, the Debtors collect,
among other things, sales taxes from its customers and other third parties for remittance to the
Taxing Authorities.  In addition, the Debtors accrue and incur state use taxes.  The Debtors
estimate that, as of the Petition Date, they hold approximately $615,708.51 in collected but

unremitted sales taxes and accrued state use taxes. The amount requested herein is nominal compared to the Debtors' total pre-petition debt. The Debtors have sufficient cash reserves and will have sufficient cash from ongoing operations and the proposed debtor-in-possession credit facility to pay the amounts described herein in the ordinary course of business.

87.   To the extent the Debtors have collected Taxes from third parties, such amounts are held in trust for the benefit of the Taxing Authorities and are not property of the estate. In addition, many state statutes, including those of Georgia (where the Debtors conduct most of their operations), hold officers and directors of collecting entities personally liable for sales and use taxes owed by those entities. To the extent that any Taxes are not paid by the Debtors, the Debtors' officers and managers may be subject to lawsuits or criminal prosecution during the pendency of this chapter 11 case. Any such lawsuit or criminal prosecution (and the attendant potential liability) would undoubtedly distract the Debtors and its officers and managers from this chapter 11 case to the detriment of all parties-in-interest.

88.   Moreover, certain of the Taxes may be entitled to priority status pursuant to certain sections the Bankruptcy Code. The payment of the Taxes contemplated in the Tax Motion will likely only affect the timing of the payment and does not prejudice the rights of other creditors of the Debtors.

**(viii)  Debtors' Emergency Motion for an Order Authorizing the Debtors to Maintain and Administer Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto (the "<u>Customer Programs Motion</u>")**

89.   In the ordinary course of the Debtors' business, the Debtors maintain certain programs regarding their customers, including, without limitation, customer warranties, repairs and rebates (collectively, the "<u>Customer Programs</u>"). The Customer Programs are designed to

enhance the Debtors' ability to generate continuing revenues in their business on a competitive basis.

90.      The Debtors provide warranties for certain of their products.  These warranties, while varying in specific terms depending on the product, generally provide that the Debtors will repair or replace materials that exhibit defects resulting from materials or workmanship at no cost to the customer within a certain amount of time after sale or installation.

91.      The Debtors, in their discretion, also repair or replace certain items erroneously delivered, or lost, or for other reasons agreed with a customer.  In the ordinary course of business, when a customer asserts such a warranty or repair claim, the Debtors reserve for the entire invoice amount pertaining to that job, inspect the location, then repair and/or replace the flooring as appropriate, or otherwise correct the deficiency in the job. If the flooring is to be replaced, the cost is incurred by the Debtors.

92.      The costs for inspections and repairs performed internally by the Debtors are not separately tracked by the Debtors.  The Debtors sometimes use external inspection and/or repair services, which costs the Debtors incur in regard to warranty and repair services.

93.      In the 12 months prior to the Petition Date, the Debtors incurred costs in regard to such warranty and repair services in the approximate amount of $8,000,000 on account of residential customers, and in the approximate amount of $2,000,000 on account of commercial customers.  The Debtors estimate that there are pending claims, as of the Petition Date, with anticipated costs of no more than approximately $1,000,000 on account of residential customers, and with anticipated costs of no more than approximately $770,000 on account of commercial

customers.  Other such warranty and repair claims likely exist as of the Petition Date, but have

not yet been asserted by customers.

94.    The Debtors offer rebates to certain customers, including volume rebates based on

sales to certain customers reaching a certain level, and the Debtors perform periodic cash and

credit settlements with certain customers in regard to overpayments on invoices (collectively,

"Rebates and Credits").  As of the Petition Date, the Debtors estimate that they owe customers

the approximate amount of $1,412,196.45 on account of pending Rebates and Credits.

95.    The Debtors respectfully request entry of an order authorizing the Debtors, in

their sole discretion, to honor or pay all pre-petition obligations arising under the Customer

Programs (the "Customer Obligations") and to continue the Customer Programs, provided,

however, that the Debtors shall be authorized, in their discretion, to satisfy pre-petition Rebate

and Credits claims in an aggregate amount not to exceed $1,400,000.  The Debtors believe that

honoring and paying the Customer Obligations and maintaining the Customer Programs is the

best way to maximize the value of the Debtors' estates and to minimize the negative impact of

this chapter 11 case on the Debtors' customers and other key business partners.

96.    The success and viability of the Debtors' business is dependent upon the loyalty

of its customers.  The Debtors believe that the uninterrupted maintenance of the Customer

Programs is essential to maintaining such loyalty.  The Customer Programs are designed to

enable the Debtors to compete effectively with other businesses who offer comparable programs.

Indeed, any project subject to a public bidding process requires a product warranty.  Thus, any

disruption which would necessarily result from the termination of some or all of these Customer

Programs would undoubtedly threaten the Debtors' customer base and have an adverse effect on

the value of the Debtors' assets and business.  If the Debtors cannot honor these standard commercial terms in its customer agreements, or are barred from honoring warranty claims arising from projects that were subject to public bidding, the Debtors' commercial reputation would suffer and future customers may turn to a competing provider, resulting in a loss of business for the Debtors.

Executed this 16th day of July, 2017.


/s/ J. Michael Pollard
J. Michael Pollard
President of Beaulieu Group, LLC


*Penalty for making a false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C. §§152 and 3571.

## EXHIBIT A

| 1. | Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases |
|---|---|
| 2. | Application for Authority to Retain Scroggins & Williamson, P.C. as Counsel to the Debtors |
| 3. | Motion for Authority to Retain American Legal Claim Services, LLC as Claims, Noticing, and Balloting Agent for the Debtors |
| 4. | Debtors' Emergency Motion for an Order Establishing Notice and Administrative Procedures |
| 5. | Debtors' Emergency Motion for an Order to Extend Time to File Schedules and Statement of Financial Affairs |
| 6. | Debtors' Motion for an Order Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals |
| 7. | Debtors' Emergency Motion for an Order Authorizing the Debtors to (A) Maintain Existing Bank Accounts and Cash Management System, and (B) Continue Use of Existing Business Forms |
| 8. | Debtors' Emergency Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment |
| 9. | Debtors' Emergency Motion for Authority to Continue Pre-Existing Insurance Programs and to Pay Pre-Petition Premiums and Related Obligations |
| 10. | Debtors' Emergency Motion for an Order Authorizing the Debtors to Pay Pre-Petition Sales, Use, Trust Fund, and Other Taxes and Related Obligations |
| 11. | Debtors' Emergency Motion for an Order Authorizing the Debtors to Maintain and Administer Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto |
| 12. | Debtors' Emergency Motion for an Order Authorizing the Debtors to Honor Pre-Petition Obligations to and Continue Pre-Petition Practices with Shippers, Warehousemen, Brokers and Other Miscellaneous Lien Claimants |
| 13. | Debtors' Emergency Motion to Authorize Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits and Related Expenses, and Other Compensation to Employees |
| 14. | Debtors' Motion For Interim And Final Orders (I) Authorizing (A) Secured Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364(C) And (D); (B) Granting Security Interests, Superpriority Claims, And Adequate Protection And (C) Use Of Cash Collateral And (II) Scheduling A Final Hearing; And Memorandum Of Points And Authorities |
| 15. | Declaration of J. Michael Pollard in Support of First Day Applications and Motions |
| 16. | Motion for Order Shortening Notice and Scheduling Expedited Hearing on First-Day Motions |

## **EXHIBIT B**

MEMBERSHIP INTERESTS OF BEAULIEU GROUP

AND ORGANIZATIONAL CHART OF THE DEBTORS

| Member | Class A Units | Voting Units | Non-Voting Units | Percentage Interest | Percentage Interest (Excluding Non-voting Units) |
|---|---|---|---|---|---|
| The CAMI Trust | 6,400 | 0 | 6,274.14 | 63.371% | 0% |
| Carl M. Bouckaert | 1,800 | 1,812.98 | 0 | 18.065% | 50% |
| Mieke Hanssens | 1,800 | 1,812.98 | 0 | 18.065% | 50% |
| Beaulieu of America, Inc. | 0 | 0 | 99.90 | .500% | 0% |
| Totals | 10,000 | 3,625.96 | 6,374.04 | 100% | 100% |